# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LUCINDA VINE, KRISTY POND, on behalf themselves and for all others similarly situated,     Plaintiffs, | § § § § § § | |
| v. | § § | EP-16-CV-31-PRM |
| PLS FINANCIAL SERVICES, INC., and PLS LOAN STORE OF TEXAS, INC.,     Defendants. | § § § § § § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this day, the Court considered Defendants PLS Financial Services, Inc. and PLS Loan Store of Texas, Inc.'s [hereinafter "Defendants"] "Motion for Summary Judgment" (ECF No. 83) [hereinafter "Motion"], filed on October 13, 2017, Plaintiffs Lucinda Vine and Kristy Pond's [hereinafter "Plaintiffs"] "Response to Defendants' Motion for Summary Judgment" (ECF No. 86) [hereinafter "Response"], filed on October 27, 2017, and Defendants' "Reply in Support of Their Motion for Summary Judgment" (ECF No. 87) [hereinafter "Reply"], filed on November 3, 2017, in the above-captioned

cause.  After due consideration, the Court is of the opinion that Defendants' Motion should be granted in part and denied in part for the reasons that follow.

## I.    FACTUAL BACKGROUND

This case arises out of a dispute concerning Plaintiffs' default on payday loans they acquired through Defendants.  Defendants are "loan brokers" that connect customers with lenders who can provide short-term loans.  Reply 13.  Both Plaintiffs applied for and obtained short-term loans through Defendants in 2012.[1]  Mot. 3–4.  In connection with those loans, both Plaintiffs executed Credit Services Agreements ("CSAs") and related loan documentation.  *Id.*  Additionally, both Plaintiffs provided Defendants with a signed, postdated check for the amount of their loan plus interest and loan fees, as is customary.  *Id.* at 4–5.  According to Plaintiffs, Defendants assured them that they would

---

[1] The evidence does not definitively show when Plaintiffs executed their respective loan agreements.  Plaintiff Vine testified to receiving her loan around February, 2012.  Vine Dep. Tr. 35:25–36:6.  Neither party provides further information regarding the exact date she received the loan.  It is similarly unclear when Plaintiff Pond received her loan.  Pond testified to having received her loan around April 9, 2012, Pond Dep. Tr. 28:11–14, but the parties claim she received her loan weeks or months after that.  *See* Mot. 3 (Defendants claiming she obtained the loan August 24, 2012); Reply 16 (Plaintiffs claiming she obtained the loan on May 4, 2012).  Thus, the evidence suggests only that both parties received loans sometime in 2012.

not ever deposit the postdated checks.  Pls.' Second Am. Class Action
Compl. 4, Sep. 26, 2017, ECF No. 76 [hereinafter "Complaint"].  Rather,
Defendants informed them that they secured the postdated checks
solely to verify that the borrowers had functional bank accounts.  *Id.*

Both Plaintiffs defaulted on the loan payments shortly after
receiving the loans.  Mot. 7.  Despite allegedly knowing that Plaintiffs'
bank accounts had insufficient funds, Defendants cashed the postdated
checks they had been provided, which "bounced."[2]  *Id.* at 7–8.
Defendants thereafter submitted "Worthless Check Affidavits" to the
Collin County District Attorney's Office [hereinafter "DA"].[3]  The DA
requires that merchants who were the victims of "theft arising from the
passing of worthless checks" submit these affidavits in order to utilize
the County's "Hot Check Loss Prevention Program" [hereinafter
"Program"].  *See Hot Checks*, CollinCountyDA.com/hot-check/ (last

---

[2] Both parties use the term "bounce" to describe Plaintiffs' banks'
refusal to honor their postdated checks due to insufficient funds in their
accounts.  *See Check*, Black's Law Dictionary (10th ed. 2014) (defining a
"bad" or "bounced" check as a "check that is not honored because the
account either contains insufficient funds or does not exist.").
Hereinafter, the Court will use the term "bounce" for purposes of
brevity.
[3] Collin County is the county in which Plaintiffs patronized PLS Loan
Store.

visited Jan. 16, 2018). The Program's "primary purpose is to receive complaints of theft arising from the passing of worthless checks and to develop those complaints into prosecutable cases." *Id.* Plaintiffs claim that Defendants' use of the Program was a fraudulent and improper attempt to collect on Plaintiffs' debt obligations. This is because Defendants allegedly knew that providing a postdated check as security for a loan does not constitute "theft arising from the passing of worthless checks." *See id.* (informing those who wish to utilize the Program that the "DA's Office cannot accept the following kinds of checks for prosecution: Post-dated or 'hold' checks" . . . [or] Checks given to pay a pre-existing debt"); Resp. Ex. A. (affiant in Worthless Check Affidavit swearing and affirming "that said check(s) was not postdated or a hold check(s)"). Further, despite the borrowers' undisputed innocence of any criminal misconduct, Defendants allegedly knew that the DA would send letters threatening those borrowers with arrest and criminal prosecution if they did not pay restitution. *See* Resp. Ex. B (ledger information provided by Defendants indicating that other borrowers had been sent letters by the DA in early 2012).

After Defendants submitted the affidavits, Plaintiffs each received letters from the DA claiming that checks "have been presented to this office for criminal prosecution[ ]" and demanding Plaintiffs pay the "amount of the check[s], [the] statutory merchant's fees, and [the] statutory DA service fees." *See* Mot. 9 (confirming that both plaintiffs received letters); Resp. Ex. H (DA's letter to Plaintiff Pond). The letters also warn that if "you do not pay the check(s) and fees within ten (10) days of the date of this letter, we will refer the matter for criminal prosecution, in which case a warrant will be issued for your arrest." Resp. Ex. H. Plaintiffs thereafter made full payments to the DA's office and neither of their cases was ever referred for criminal prosecution. Mot. 10. Plaintiffs object to Defendants' practice because, they claim, it misused the Hot Check Program as a means of debt collection by indirectly threatening borrowers with arrest and prosecution if they did not pay.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed their original complaint on December 17, 2015. Mot. 11. Plaintiffs, on behalf of themselves and others similarly situated, allege (1) malicious prosecution, (2) violations of the Texas

Deceptive Trade Practices Act ("DTPA"), (3) fraud, and (4) violations of Texas Finance Code § 392.301 (Texas Debt Collection Act—"TDCA"). Compl. 5–7. Defendants removed the case on January 26, 2016, based on diversity jurisdiction. Not. Removal, ECF No. 1. On March 23, 2016, Defendants filed a "Motion to Dismiss and to Compel Lucinda Vine to Arbitration" (ECF No. 19). The Court denied that motion. Order, June 6, 2016, ECF No. 37. Defendants moved for reconsideration, which the Court also denied, Order, Aug. 11, 2016, ECF No. 53, and Defendants filed an interlocutory appeal. *See* Mot. to Stay Proceedings Pending Mot. to Reconsider and Interlocutory Appeal, July 1, 2016, ECF No. 44.

The Fifth Circuit upheld the Court's denial of Defendants' motion to compel arbitration on May 19, 2017. *See Vine v. PLS Fin. Servs., Inc.*, 689 F. App'x 800 (5th Cir. 2017). The Court thereafter held a status conference to discuss class action certification and how to proceed with discovery. After the conference, the Court granted the parties sixty days to conduct limited discovery "for matters relating to class certification[.]" Preliminary Scheduling Order, June 26, 2017, ECF No. 64. Shortly after Plaintiffs filed a motion for class certification on

6

September 12, 2017, Defendants filed the instant Motion requesting
summary judgment on October 13, 2017.  In the Motion, Defendants
argue that all of Plaintiffs' claims are either legally invalid or
unsupported by the evidence adduced during the limited discovery
phase.  The Court will address each argument raised in the Motion in
turn.

## III.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall
grant summary judgment if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment
as a matter of law."  A genuine dispute will be found to exist "if the
evidence is such that a reasonable jury could return a verdict for the
nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347,
350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 248 (1986)).

"Under Federal Rule of Civil Procedure 56(c), the party moving for
summary judgment bears the initial burden of . . . 'identifying those
portions of [the record] which it believes demonstrate the absence of a
genuine issue of material fact.'" *Norman v. Apache Corp.*, 19 F.3d 1017,

1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Rule 56(c) mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Where this is the case, "there can be 'no genuine issue as to any material fact,' since complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (quoting Rule 56(c)).

In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

## IV.   ANALYSIS

### A.   Whether PLS Financial is a Proper Defendant

As an initial matter, the Court must address whether PLS Financial is a proper defendant in this case. Defendants aver that PLS

Financial and PLS Loan Store are "distinct entities" and that "PLS Financial is entitled to summary judgment on all claims because it was not involved in any way in the conduct alleged in this lawsuit."  Mot. 13. Defendants claim PLS Financial is an Illinois corporation with no offices or operations in Texas and that it "was never involved in the process by which PLS Loan Store arranged, approved, or denied any loan[.]"  *Id.*  Accordingly, they request that the Court grant summary judgment on all claims in favor of PLS Financial.  Mot. 13.

Plaintiffs do not distinguish PLS Financial and PLS Loan Store at all in their Complaint, and simply refer to both Defendants jointly as "PLS."  *Id.*  However, Plaintiffs counter that they have not had an opportunity to discover facts that might allow them to contest Defendants' claim that PLS Financial was never involved in the alleged conduct.  Resp. 19.  While Plaintiffs admit that they "cannot verify or refute" this claim, they "request this Court allow Plaintiffs to conduct written discovery into this issue and take all necessary depositions before this Court rules on whether PLS [Financial] is a proper party[.]"  *Id.*

"[S]ummary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986); *see also Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) ("[W]e believe that the district court in this case should have deferred ruling on the motion for summary judgment until the necessary discovery was complete."). Federal Rule of Civil Procedure 56(e) provides that "[i]f a party fails to properly support an assertion of fact . . . the court may: (1) give an opportunity to support or address that fact . . . [or] (4) issue any other appropriate order."

Here, the Court concludes that summary judgment regarding PLS Financial's involvement in any alleged wrongdoing is premature at this time. As Plaintiffs highlight, the only discovery that the Court has allowed thus far is a two-month period to complete limited discovery "for matters relating to class certification[.]" Preliminary Scheduling Order, June 26, 2017, ECF No. 64. Thus, the Court will allow Plaintiffs an opportunity to support their claim that PLS Financial is involved in

10

the alleged wrongdoing and deny without prejudice Defendants' request for summary judgment on this ground.[4]

## B.    Malicious Prosecution

Plaintiffs first claim that "PLS wrongfully initiated criminal proceedings against Lucinda Vine, Kristy Pond and the remaining class members."  Compl. 6.  Defendants argue that Plaintiffs cannot legally satisfy the elements of a malicious prosecution claim.  Mot. 14.  The Court agrees with Defendants, and will therefore grant summary judgment in their favor on Plaintiffs' malicious prosecution claim.

Competing interests motivate the law of malicious prosecution in the State of Texas.

---

[4] Defendants contend in a footnote in their Reply that the "only rule" that could entitle Plaintiffs to discovery on this issue is Fed. R. Civ. Proc. 56(d), which allows discovery "[w]hen [f]acts [a]re [u]navailable" if plaintiffs show "by affidavit or declaration that . . . it cannot present facts essential to justify its opposition."  Reply 11.  Since Plaintiffs have filed no such declaration or affidavit, Defendants argue that PLS Financial should be dismissed due to lack of any evidence of involvement.  However, the Court here acts pursuant to its Rule 56(e) authority, which does not require Plaintiffs to make any affirmative showing that they are entitled to discovery.  Further, Defendants' request for summary judgment at this stage in the litigation is contrary to the spirit of the Federal Rules.  Defendants cite no law entitling them to summary judgment for lack of evidence after the pleading stage but prior to the initiation of full discovery.  If Defendants wanted to dismiss PLS Financial prior to discovery, the proper motion would have been a Rule 12(b)(6) motion, which Defendants did not file.

> The first is the interest of society in the efficient enforcement of the criminal law, which requires that private persons who aid in the enforcement of the law should be given an effective protection against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused.  The second is the interest that the individual citizen has in being protected against unjustifiable and oppressive litigation of criminal charges, which not only involve pecuniary loss but also distress and loss of reputation.

*Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 290 (Tex. 1994) (quoting RESTATEMENT (SECOND) OF TORTS SEVEN ch. 29 intro. note (1977)).  "These interests are balanced by carefully defining the elements of an action for malicious prosecution, and the balance is maintained by strictly adhering to these elements."  *Id.* at 291.  "To prevail on a malicious-prosecution claim, a plaintiff must establish the following elements: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation or procurement) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff."  *Vine v. PLS Fin. Servs., Inc.*, 226 F. Supp. 3d 719, 728 (W.D. Tex. June 6, 2016), reconsideration denied, 226 F. Supp. 3d 708 (W.D. Tex. Aug. 11, 2016), and aff'd, 689 F. App'x 800 (5th Cir.

2017) (citing *Davis v. Prosperity Bank*, 383 S.W.3d 795, 802 (Tex. App.–Houston [14th Dist.] 2012, no pet.)).

Pursuant to Texas Law, a "criminal prosecution is initiated when a formal charge is made to law enforcement authorities, that is, when the charging instrument which goes before the magistrate is executed." *Fishman v. C.O.D. Capital Corp.*, No. 05-16-00581-CV, 2017 WL 3033314, at *5 (Tex. App.—Dallas 2017, no pet.).  A criminal investigation, without any subsequent prosecution, is insufficient to support a malicious prosecution claim.  *Id.* at *17; *see also Thompson v. City of Galveston*, 979 F. Supp. 504, 509 (S.D. Tex. 1997), aff'd, 158 F.3d 583 (5th Cir. 1998) ("Mere interrogation or announcing the confession of a suspect does not constitute 'prosecution' for that crime.").

Here, Plaintiffs allege that "after the check[s] bounced, PLS contacted the District Attorney's Office" and informed them that "the members of the [putative] Class wrote bad checks and committed theft by check."  Compl. 5.  They allege that "PLS had the District Attorney's Office send demand letters threatening criminal prosecution."  *Id.*

13

Further, they claim that "PLS[5] knowingly, fraudulently, and falsely threatened and/or filed criminal charges against borrowers." *Id.* Finally, they allege "PLS agents pursued criminal actions against more than 600 of its customers[.]"  Resp. 2.

However, Plaintiffs do not allege that the State of Texas ever initiated any formal criminal proceedings against any PLS customers. While the demand letters that Plaintiffs received threatened *future* prosecution, Plaintiffs point to no precedent supporting a malicious prosecution claim where the prerequisite criminal charges are merely hypothetical.  Further, Plaintiffs all but admit that such a claim is insufficient in their Response by acknowledging that "they may not meet the requirements of a malicious prosecution claim at this time[.]" Resp. 19.  Accordingly, the Court concludes that Plaintiffs' malicious prosecution claim fails as a matter of law and that Defendants' Motion should be granted with respect to this claim.

### C.    Texas Deceptive Trade Practices Act ("DTPA")

Plaintiffs next claim that Defendants' practices violated the DTPA.  Compl. 6.  The DTPA protects consumers against "false,

---

[5] As stated earlier, Plaintiffs do not distinguish PLS Loan Store and PLS Financial in the Complaint.  For brevity, any of the Court's references to "PLS" also refers to both Defendants.

misleading, and deceptive business practices, unconscionable actions, and breaches of warranty[.]" Tex. Bus. & Com. Code Ann. § 17.44 (West). Claims brought pursuant to the DTPA are subject to a two-year statute of limitations, which accrues on the date the plaintiff discovers, or reasonably should have discovered, the alleged false, misleading, or deceptive act or practice giving rise to the claim. *Id.* at § 17.565. Plaintiffs bring multiple causes of action pursuant to the DTPA. First, they bring DTPA claims "[p]ursuant to Chapters 392 and 393 of the Texas Finance Code" which are "actionable under" the DTPA. Compl. 6; *see* Tex. Fin. Code Ann. § 392.404 (West) ("A violation of this chapter is a deceptive trade practice actionable under [the DTPA]"); *id.* at § 393.504 (same). These are referred to as "tied-in" claims. Second, they claim that Defendants' alleged actions violate "numerous provisions" of the DTPA itself, specifically including § 17.46, which concerns failure to disclose material information about a transaction in order to induce a consumer into making the transaction. *Id.*

### 1.   Whether Plaintiffs are DTPA "Consumers"

Defendants argue that Plaintiffs are not "consumers" within the meaning of the DTPA, and thus are prohibited from filing suit pursuant

to that statute.  Mot. 18.  "As a general rule, only consumers have standing to file DTPA claims." *Wicker v. Bank of Am., N.A.*, No. EP-14-CV-91-PRM, 2014 WL 10186157, at *4 (W.D. Tex. Aug. 27, 2014) (citing *Riverside Nat. Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex.1980)).  To qualify as a consumer, "a person must have sought or acquired goods or services by purchase or lease." *Id.* (citing *Cameron v. Terrell & Gerrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981)).  "'Goods' are defined as 'tangible chattels or real property purchased or leased for use.'" *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 388 (Tex. 1982) (quoting Tex. Bus. & Com. Code Ann. § 17.45(1) (West)).  "'Services' include 'work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods.'" *Id.* (citing Tex. Bus. & Com. Code Ann. § 17.45(2) (West)).  Further, "the goods or services purchased or leased must form the basis of the complaint." *Hopkins v. Green Dot Corporation*, No. 5:16-CV-365-DAE, 2016 WL 4468272, at *4 (W.D. Tex. Aug. 24, 2016) (citing *Cameron*, 618 S.W.2d at 539).

In *Riverside Nat. Bank v. Lewis*, the Texas Supreme Court considered "the question whether one who seeks a loan from a bank in

order to refinance a car qualifies as a 'consumer' under the Deceptive Trade Practices Act."  603 S.W.2d 169, 170 (Tex. 1980).  The court rejected the notion that money was a "good" and held that a lender does not provide a "service" under the DTPA.  *Id.* at 174–75.  Thus, a borrower typically cannot bring a DTPA claim against a lender.

Defendants initially argue that since Plaintiffs here "only sought to borrow money," they are not DTPA consumers because money is not a good and lending is not a service.  Mot. 19.  However, the issue is not so simple.  Defendants are "loan brokers" rather than lenders—they act as a middleman between the borrower and lender and charge a fee to connect the two entities.[6]  *Riverside* explicitly refused to decide whether

[6] In its "Operating Procedures and Guidelines," Defendants implore their own employees to "understand the distinction between a loan broker and a lender and . . . properly communicate this distinction to customers[.]"  Resp. Ex. G at 7.  Yet, neither party has attempted to affirmatively explain this nuanced distinction to the Court.  The Court has gleaned some information after reviewing the evidence provided, but the nature of Defendants' business is still unclear.  Apparently, Defendants *do not* provide loans, but rather charge an independent fee as middlemen to connect consumers with a third-party lender, which charges its own interest on the loan.  Resp. Ex. E at 1.  Further, the Credit Services Agreement that Plaintiffs signed explains seven other services in addition to the middleman service that Defendants were obligated to provide to Plaintiffs in connection with their purchase.  *Id.* These other services include: "assist[ing] [customers] in preparing and completing documents necessary to obtain the loan"; "assist[ing customers] in creating a positive credit history"; "assist[ing customers]

collateral services incidental to obtaining a loan, including loan brokerage services, constitute actionable "services" under the DTPA. 603 S.W.2d at 175 n.5.

Shortly after *Riverside*, a Texas court of appeals allowed DTPA claims against a loan brokerage service where the complaint was directed at the "characteristics, uses, benefits and standards" of that service. *Lubbock Mortg. & Inv. Co. v. Thomas,* 626 S.W.2d 611, 613 (Tex. App.—El Paso 1981, no writ) ("Thus, in consideration for the value it received, [the loan broker] could and did offer only a 'service' as that term is used in *Riverside*.").

Following *Thomas*, Texas courts have consistently reaffirmed the validity of DTPA claims against loan brokers. *See Lubbock, E.F. Hutton & Co. v. Youngblood*, 708 S.W.2d 865, 868 (Tex. App.—Corpus Christi 1986, writ granted), aff'd, 741 S.W.2d 363 (Tex. 1987) (holding that "services" under the DTPA includes "services of a 'loan broker' in attempting to obtain a loan for a borrower"); *Mercantile Mort. Co. v. Univ. Homes*, 663 S.W.2d 45, 47–48 (Tex. App.—Houston [14th Dist.] 1983, no writ) ("[B]rokers of loans, unlike lenders, are subject to the

in making [their] payments timely"; "provid[ing] consumer financial education materials"; and "provid[ing] discounted check cashing services to facilitate payment(s)[.]"  *Id.*

18

provisions of the DTPA."); *see also Montalvo v. Bank of Am. Corp.*, 864 F. Supp. 2d 567, 575–77 (W.D. Tex. Mar. 30, 2012) (reaffirming that "loan broker" customers are consumers pursuant to the DTPA). Thus, the Court concludes that Texas state law dictates that loan brokerage services, like those at issue in this case, are actionable under the DTPA.

Despite the clear language in these cases, Defendants argue that subsequent decisions have eroded their legal foundation. They claim that while the loan-broker cases have never been explicitly overruled, they are "contrary to the established law in both Texas and the Fifth Circuit that incidental services do not suffice" to create DTPA standing. Reply 3. In support of this counter-argument, Defendants cite an unpublished Fifth Circuit opinion, a published Fifth Circuit opinion, and a Texas Supreme Court case—none of which mention the line of cases involving loan brokers.

Contrary to Defendants' assertions, neither these three cases, nor any other Texas law, overrule the loan broker cases. First, the unpublished decision holds that the "servicing or administration of [a] loan is incidental to that objective, and does not bestow consumer status." *Payne v. Wells Fargo Bank Nat. Ass'n*, 637 F. App'x 833, 837

(5th Cir. 2016). While this decision is unpublished and is of questionable precedential value, it merely stands for the proposition that the servicing and administration of a loan are incidental to that loan and do not create a cause of action against the lender under the DTPA. *Id.* That is a far cry from overruling the multiple cases that squarely hold that loan brokers do indeed provide a cognizable service, or holding that all services relating to a loan are not DTPA services.

Second, Defendants cite a published Fifth Circuit case for the oversimplified proposition that "incidental services do not suffice" to confer consumer status. Reply 3 (citing *Federal Deposit Ins. Corp. v. Munn*, 804 F.2d 860, 865 (5th Cir. 1986)). Defendants are correct that that some services incidental to the acquisition of certain goods or services are not actionable under the DTPA. *See Munn*, 804 F.2d at 865. However, *Munn* also held that incidental services *are* actionable if they are "important objective[s] of the transaction" themselves. *Id.* Evidence indicating whether an incidental service is an "important objective" includes, for example, whether the plaintiff considered the services "important enough to seek them separately," whether the plaintiff undertook "an important course of action" based on the service,

and the source of financing for the service.  *Id.*  In ultimately reversing the district court and remanding the case, the *Munn* court held that the evidence was conflicting and that a jury should have decided whether the incidental services at issue were an "important objective" of the underlying transaction.  *Id.*

    *Munn* does not hold, as Defendants suggest, that the DTPA prohibits all causes of action based on any services performed in broad relation to the acquisition of a non-actionable good or service.  Rather, it states that services "collateral" or "incidental" to non-actionable services do provide DTPA standing as long as that incidental service is "important" and "central" to the underlying transaction.  Texas courts have not attempted to reconcile *Munn* with the loan broker cases.  The loan broker cases do not conduct any analysis into whether loan brokerages are central to or important in a plaintiff's ultimate objective of obtaining a loan from a third party.  However, rather than implicitly overruling them, *Munn* appears to stand in harmony with those cases.[7]

---

[7] It is important to note that *Munn* decided the circumstances under which a plaintiff can sue a lender—not a loan broker—for services incidental to a loan.  It may be distinguishable on that fact alone, and thus wholly irrelevant to the current case involving loan brokers.

The evidence in this case suggests that loan brokers do not merely "facilitate" lending, as Defendants claim, they instead enable it. If Defendants' services were not an essential part of the transaction, borrowers would presumably have avoided the "708.90% annualized rate on the amount financed" that Defendants charged them. *See* Resp. Ex. E at 1 ("Credit Services Agreement" signed by Plaintiff Pond). It is the very necessity of Defendants' unique service, separate and apart from the lender (who charges only 10% yearly interest, *id.*), that allows Defendants to charge such a hefty fee and still attract customers. The disparity in the cost of Defendants' service compared to the actual lender's costs belies Defendants' assertion that its service was not a central objective in the loan process. In reality, it appears their service was fundamental to Plaintiffs' ability to ultimately obtain a loan. Thus, loan brokerage services appear to satisfy any requirements *Munn* set forth for services incidental to obtaining a loan.

The third case Defendants cite illustrates the *Munn* rule that incidental services can suffice as long as they too are a central objective of a plaintiff's transaction. In *Arthur Anderson & Co. v. Perry Equip. Corp.*, the plaintiff sought to purchase an intangible good—a company.

22

945 S.W.2d 812, 814 (Tex. 1997). Generally, purchasers of companies do not have standing under the DTPA to sue the former owners of the acquired companies. *See Riverside*, 603 S.W.2d at 172 ("'Goods' means tangible chattels bought for use."); c*f. Portland Savings & Loan Association v. Bevill, Bresler & Schulman Government Securities, Inc.*, 619 S.W.2d 241, 245 (Tex. Civ. App.—Corpus Christi 1981, no writ) (holding that purchasers of stock do not have DTPA standing). Thus, consumers of any collateral services "merely incidental" to the purchase of a company would not have standing under the DTPA.

As a condition of sale, the buyer required the seller to commission an independent audit from an accounting firm on the company's financial condition. *Arthur Anderson*, 945 S.W.2d at 814. After the audit and purchase were completed, the company started to collapse, and the buyer sued the accounting firm for "serious errors" in its report. *Id.* The accounting firm argued that it did not provide a "service" actionable under the DTPA because their service was acquired in relation to the connection of an intangible good, and was therefore merely incidental. *Id.* at 815. However, the Supreme Court rejected this argument. *Id.* The court reasoned that the audit service was

23

"required" and "central" to the ability to consummate the purchase, and thus that assessing the company's financial condition was the "primary objective" in commissioning the service. *Id.* Since the audit service formed the basis of the complaint separate and apart from the pursuit of acquiring the company, the court held that the plaintiff had standing under the DTPA.

Significantly, nothing in this Texas Supreme Court opinion contradicts or overrules the loan broker cases. Loan brokers offer services independent of the loans their customers receive, just like the auditors in *Arthur Anderson* offered services independent of the transaction they enabled. *Arthur Anderson* confirms that the bar on "incidental services" does go so far as to taint any service that a plaintiff seeks in connection with a non-actionable good or service. Rather, so long as an incidental service is sufficiently independent of a non-actionable good or service, it still confers DTPA standing.

Defendants' contention that the loan broker cases are undermined by subsequent law is unavailing. Thus, the Court rejects Defendants' argument that loan brokers do not provide DTPA services and

concludes, consistent with Texas law, that loan broker customers are "consumers" pursuant to the DTPA.

### 2.   Whether the DTPA Claims are Time Barred

Defendants contend that all claims brought pursuant to the DTPA are time-barred due to its two-year statute of limitations.  Mot. 20.  The Court agrees that all claims brought pursuant to the DTPA itself, with the exception of the statutory claims tied-into the DTPA discussed below, are time barred.  Thus, the Court will grant summary judgment with respect to those claims.

Although Plaintiffs do not provide specific dates for any of the misconduct alleged in their Complaint, they do not appear to contest Defendants' assertion that the District Attorney sent letters out to the Plaintiffs in March and October of 2012.  *See* Mot. 9 (citing Pond Dep. Tr. 49:14–51:8; Vine Dep. Tr. 33:10–34:14).  Plaintiffs do not allege that any misconduct occurred after those letters were sent.  Thus, in order to bring claims within the DTPA's statute of limitations, Plaintiffs would have had to file suit before October 2014, at the latest.  *See* Tex. Bus. & Com. Code Ann. § 17.565 (providing that DTPA claims have a two-year statute of limitations).  This lawsuit was filed in December 2015, over a

year after the limitations period expired.  *See* Not. Removal Ex. A.

Thus, the Court concludes that any causes of action brought purely

pursuant to the DTPA are time barred.  Therefore, the Court will grant

summary judgment on all claims of violations of the DTPA itself,

excluding the tied-in claims.

> 3.    Whether the § 392 Claim Brought Under the DTPA is Time Barred

Texas Finance Code § 392.404 states that a "violation of this

chapter is a deceptive trade practice" that is "actionable" under the

DTPA.  Defendants argue that tied-in claims like this one are subject to

the DTPA's two-year statute of limitations.  Despite the DTPA's statute

of limitations, Plaintiffs claim that a four-year statute of limitations

applies because § 392 claims are "suits for debt," which exempts them

from the two-year DTPA limitation.  *See* Tex. Civ. Prac. & Rem. Code

Ann. § 16.004 (West) ("(a) A person must bring suit on the following

actions not later than four years after the day the cause of action

accrues: . . . (3) debt").  However, Plaintiffs do not explain how their suit

alleging improper tactics in the recovery of debt constitutes a "suit for

debt."  Further, even if it were such a suit, Plaintiffs point to no law

suggesting that this general limitation from an entirely separate code

26

section trumps the specific two-year limitation provided in the DTPA. In fact, the only cases that have considered § 392 claims brought under the DTPA suggest the two-year statute of limitations still applies. *See Bashore v. Bank of Am.*, No. 4:11-CV-93, 2012 WL 629060, at *6 (E.D. Tex. Feb. 27, 2012), report and recommendation adopted, No. 4:11-CV-93, 2012 WL 1080864 (E.D. Tex. Mar. 30, 2012) (commenting, without deciding, that the two-year statute of limitations was applicable to a § 392 claim tied into the DTPA); *McCartney v. CitiFinancial Auto Credit, Inc.*, No. 4:10-CV-424, 2010 WL 5834802, at *7 (E.D. Tex. Dec. 14, 2010), report and recommendation adopted, No. 4:10-CV-424, 2011 WL 675386 (E.D. Tex. Feb. 16, 2011) (holding that "a violation of the DTPA[,]" including tied-in § 392 claims, "must be brought within two years from the time the cause of action accrues"). Thus, the Court concludes that the § 392 claim brought under the DTPA is time barred, and accordingly grants summary judgment on that claim.

### 4. Whether the § 393 Claim Brought Under the DTPA is Time Barred

Compared to § 392, Texas Finance Code § 393 raises a more challenging question because that section specifically provides a four-year limitations period even for claims tied into the DTPA. *See* Tex.

27

Fin. Code Ann. § 393.505 (West) ("An action under Section . . . 393.504[,]" the DTPA tie-in provision, "must be brought not later than the fourth anniversary of the date on which the contract to which the action relates is executed.").  This provision presents a conflict between two different statutes of limitations:  the two-year DTPA period and the four-year § 393 period.  Defendants argue that even though § 393 provides a four-year statute of limitations specifically for violations of that code section tied into the DTPA, the DTPA's all-encompassing limitations period trumps the more specific provision.

The parties fail to provide the Court with precedent that resolves this conflict.  Defendants cite two district court cases for the proposition that all DTPA claims are subject to the two-year limitation, "regardless of whether they are based at least in part on tie-in statutes like Plaintiffs'."[8]  Mot. 21.  However, these cases cannot be read so broadly.

---

[8] Defendants also cite a third case where the Court dismissed a Texas Insurance Code Article 21.55 ("Article 21.55") claim brought under the DTPA as time barred.  *Cavil v. Trendmaker Homes, Inc.*, No. CIV.A. G-10-304, 2012 WL 37212, at *1 (S.D. Tex. Jan. 6, 2012).  They also cite a fourth case that found that Article 21.55 has a four-year statute of limitations.  *See Rx.com Inc. v. Hartford Fire Ins. Co.*, 426 F. Supp. 2d 546, 563 (S.D. Tex. 2006).  They argue that since *Cavil* applied the two-year DTPA period to this insurance code claim that the *Hartford* court found has a four-year limitations period, all claims tied into the DTPA must be subject to the two-year period.  However, *Cavil* does not

28

Neither of the cases involved § 393 or any other statute with a DTPA tie-in provision that provided its own statute of limitations. Contrary to Defendants' assertions, these cases do not suggest that courts should ignore a clear legislative command to apply a four-year statute of limitations to a specific claim because of the DTPA's general two-year provision. Instead, these cases suggest that when statutes that do not have specific limitations are tied into the DTPA, the two-year limitations period is the applicable default. *See Bashore*, 2012 WL 629060 at \*6 (holding the DTPA's two-year limitation "would likely" apply to a Texas Finance Code Chapter 392 claim, which does not include a statute of limitations); *McCartney*, 2010 WL 5834802 at \*7 (dismissing as untimely Texas Finance Code § 392 claims brought under the DTPA after two years). Here, since § 393 does contain its own statute of limitations, this default does not apply. Thus, the Court is left with two conflicting statutes with different limitations periods.

---

mention Article 21.55 at all in the opinion, and it is entirely unclear whether that claim was actually before the Court in dismissing the case. Even if it were, the case provides no applicable reasoning that the Court can potentially apply in this case. Thus, *Cavil* provides little support for Defendants' position that all tied-in claims are subject to the two-year limitations period.

When two statutory provisions conflict, courts may turn to principles of statutory interpretation to help resolve the conflict. *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010) ("[I]f [courts] cannot discern legislative intent in the language of the statute itself . . . [courts should] resort to canons of construction or other aids such as which statute is more specific."). One such principle applicable here is that "[a] general statutory rule usually does not govern unless there is no more specific rule." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989); *see also White v. Sturns*, 651 S.W.2d 372, 374 (Tex. App.—Austin 1983, writ ref'd n.r.e) ("The specific statute is thus regarded as an exception to, or a qualification of, any previously enacted general statute on the same subject, which must yield in its scope and effect to the specific provisions of a later statute.").

With this principle in mind, the Court concludes that the clear statutory text applicable to this exact situation controls over the broader provision applicable across a range of actions. As further support for this conclusion, the legislature passed the more specific limitation period in § 393 almost twenty years after it passed the DTPA. *Compare* Finance Code, 1997 Tex. Sess. Law Serv. Ch. 1008 (H.B. 10)

30

(Vernon's) *with* Business and Commerce Code, 1979 Tex. Sess. Law Serv. Ch. 603 (Vernon's).  Courts must assume that "Congress passed each subsequent law with full knowledge of the existing legal landscape[.]"  *In re Nw. Airlines Corp.*, 483 F.3d 160, 169 (2d Cir. 2007) (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)).  Thus, the Court concludes that the four-year limitations period is applicable and that this claim is not time barred.  Accordingly, the Court will deny Defendants' Motion on this claim.

### 5.    Whether the § 393 Claim Involves a Disputed Issue of Material Fact

Defendants next argue that even if the § 393 claim is not time barred, Plaintiffs have not presented sufficient evidence of a violation of this section to raise a question of disputed fact.  Mot. 22.  Texas Finance Code § 393.305 prohibits credit services organizations, like Defendants, from "directly or indirectly engag[ing] in a fraudulent or deceptive act, practice, or course of business relating to the offer or sale of the services of the organization."  Defendants argue that "there is no evidence of any 'fraudulent or deceptive act, practice, or course of business relating to the offer or sale of the services of'" PLS Loan Store.  Mot. 22 (citing Tex. Fin. Code Ann. § 393.305).  Further, they claim that to the extent any

allegedly wrongful act was committed *after* the "offer or sale" of their services (such as any misrepresentations to the DA), those actions do not fall within the ambit of the statute. *Id.*

Viewing the evidence in a light most favorable to Plaintiffs, there is ample evidence suggesting that Defendants directly or indirectly engaged in a deceptive act, practice or course of business relating to the offer or sale of Defendants' services. This evidence relates to both alleged misrepresentations and omissions made at the time Plaintiffs acquired Defendants' services, as well as Defendants' subsequent alleged misrepresentations to the DA. The contract that both Plaintiffs signed upon purchasing Defendants' service states explicitly that "[a] person may not threaten or pursue criminal charges against you related to a check . . . provided by the consumer as security for a loan[.]" Resp. Ex. E at 2. Defendants' own Operating Procedures and Guidelines contain multiple prohibitions against the specific practices alleged here and refer to those practices as "false or misleading" and "unfair." *See* Resp. Ex. G. at PLS000252–53. For example, under the "FALSE OR MISLEADING REPRESENTATIONS" header, Defendants' policies state that "employees may not . . . [f]alsley represent that the customer

32

committed a crime" or [f]alsely represent or imply that nonpayment of any debt will result in the arrest or imprisonment of any person[.]" *Id.* Under the "UNFAIR PRACTICES" header, employees are prohibited from "[s]olicit[ing] a post-dated check to use as a threat or to institute criminal prosecution." *Id.* at PLS 000253.

Yet, Defendants themselves admit that at a very minimum, "a few employees . . . contrary to company policy . . . submitted affidavits and customers' bad checks to the local DA's office," presumably as a tactic to collect on Plaintiffs' debt. Mot. 8. This is despite the clear indications—of which a reasonable person would have been on notice—that postdated checks that bounce are not illegal "hot checks" and thus not prosecutable.[9] The letters sent by the DA as a result of those affidavits informed the Plaintiffs that the "check(s) described below have been presented to this office for criminal prosecution" and that if they did not pay within ten days, the DA would "refer the matter for criminal prosecution, in which case a warrant will be issued for your arrest." *See*

[9] The Collin County District Attorney's website states that the "DA's Office cannot accept the following kinds of checks for prosecution: Post-dated or 'hold' checks[.]" *Some Things a Merchant Should Know*, CollinCountyDA.com/hot-check/ (last visited Jan. 16, 2018). Further, Defendants submitted affidavits to the DA's Office along with the checks stating "I hereby swear of affirm that . . . said check(s) was not postdated or a hold check(s)[.]" Resp. Ex. A.

Resp. Ex. H.  Not only is this alleged practice "misleading" and "unfair" to the consumers (words found in Defendants' own Operating Procedures and Guidelines), it also allegedly involved misrepresentations to a law enforcement agency.  Whether or not Defendants made the demands themselves or used the DA as an intermediary to make the demands is irrelevant:  the statute prohibits participating in deceptive practices both directly and indirectly.

Plaintiffs allege that Defendants requested a postdated check from them, misrepresented or failed to disclose at the time of the transaction how the check would be used, cashed that check when Plaintiffs defaulted on their loan payments, then tendered false reports to a law enforcement agency in order to produce a demand letter for payment on their debt.  *See generally* Compl.  There is ample evidence to support those claims.  Thus, the Court concludes there is a disputed question of material fact as to whether Defendants engaged in a "fraudulent or deceptive act" pursuant to § 393.305.

Finally, Defendants provide no legal support for their argument that because the alleged misrepresentations to the DA occurred after the initial transaction, Plaintiffs cannot state a claim.  The statute

prohibits a "fraudulent or deceptive act, practice, or course of business *relating to* the offer or sale of the services of the organization." Tex. Fin. Code § 393.305 (emphasis added). There is no temporal requirement that the alleged practice occur at the specific time of the transaction. Thus, since Defendants do not argue that the alleged misrepresentations to the DA do not relate to the transactions involving Plaintiffs, this argument fails.

Accordingly, the Court concludes that Plaintiffs have properly stated a § 393 claim, and that there is sufficient evidence to create questions of material fact regarding that claim sufficient to deny summary judgment.

### D.    Fraud

Plaintiffs claim that Defendants' alleged debt collection practices involved the use of fraud. Defendants counter that Plaintiffs have not presented sufficient evidence to satisfy all elements of a fraud claim. In Texas, those elements are: (1) a material misrepresentation; (2) that was either known to be false when made or made without knowledge of its truth; (3) which was intended to induce reliance; (4) which was relied upon; and (5) which caused injury. *Dow Chemical Co. v. Francis*, 46

35

S.W.3d 237, 242 (Tex. 2001) (per curiam).  Defendants focus on the first and fourth elements in their Motion and argue that Plaintiffs have not produced any evidence of an actionable misrepresentation, or that they relied on any such misrepresentation.  Thus, the Court will analyze only those two elements and assume the other elements are sufficiently satisfied for purposes of summary judgment.

### 1.    Whether There were Actionable Misrepresentations

In addition to affirmative misrepresentations, an omission constitutes a misrepresentation if Defendants failed to disclose "a material fact in light of a duty to disclose."  *Smith v. BCE Inc.*, 225 F. App'x 212, 218 (5th Cir. 2007).  In their Motion, Defendants identify four misrepresentations at issue.[10]  Mot. 24–26.  First, Plaintiffs allege that Defendants specifically told Plaintiffs that they would not deposit their postdated checks and that it was only needed to "verify the customer has a bank account."  *See* Compl. 4.  Second, Plaintiffs allege that Defendants told Plaintiffs that they would not "pursue criminal charges to recover the loan" if Plaintiffs defaulted.  *Id.* at 5.  Third,

---

[10] The Court will only pass upon the allegations Defendants identified in their Motion.  To the extent there are other allegations Defendants do not identify, the Court reserves judgment on those.

Plaintiffs allege that Defendants failed to disclose the practice of sending these bounced checks to the DA even though Defendants had engaged in this practice previously. *Id.* And fourth, Plaintiffs allege that Defendants allegedly misrepresented to the DA's office that the postdated checks were "bad checks" and that the Plaintiffs had committed "theft by check." *Id.*

### i. Stating that Defendants Would not Deposit Plaintiffs' Checks

Defendants first argue that there is no evidence suggesting they told Plaintiffs that they would not cash the postdated checks Plaintiffs provided. However, the Court need not decide whether there were any material misrepresentations regarding depositing Plaintiffs' checks. As explained more fully below, the Court concludes that Plaintiffs could not have justifiably relied on any such misrepresentations. Thus, the Court will grant summary judgment on this portion of the fraud claim.

### ii. Stating that Defendants Would not Threaten or Pursue Criminal Charges in Relation to the Loans

Second, Defendants argue that there is no evidence suggesting they told Plaintiffs that they would not engage in the specific practice they engaged in. However, Defendants explicitly told Plaintiffs in their

37

Credit Services Agreement that they would not "threaten or pursue criminal charges against you related to a check or other debit authorization provided by the consumer as a security for the loan[.]" Resp. Ex. E at 2. This is sufficient evidence standing alone to suggest a misrepresentation. Defendants contend that since "no criminal charges were ever filed against Plaintiffs[,]" representations that Defendants would not file criminal charges were true. Mot. 25. *Id.* This argument is unconvincing. The CSA that Plaintiffs signed upon receiving their loans states Defendants would not "threaten or pursue" criminal charges. Resp. Ex. E. at 2. It makes no mention of "filing" criminal charges. The evidence suggests that Defendants inappropriately submitted Plaintiffs' bounced checks to a local DA's office in order to "pursue" criminal remedies. *See, e.g.*, Resp. Ex. A (Defendants' Worthless Check Affidavit). The evidence also appears to show an explicit statement by Defendants that they would not take such action. *See* Resp. Ex. E (CSA). This is sufficient evidence to suggest a misrepresentation.

### iii.    *Failing to Disclose that Defendants Would not Threaten or Pursue Criminal Charges in Relation to the Loans*

Third, Plaintiffs allege that even though Defendants had deposited customers' postdated checks before and sent those bounced checks to the DA's office, they failed to disclose this practice to Plaintiffs.  Plaintiffs claim this constitutes "fraud by omission."  Resp. 10.  Defendants counter that Plaintiffs do not even remember the exact nature of the conversations with loan store employees and, even if they did, there was no omission because Defendants never technically "filed" criminal charges.  Mot. 24–25.  As an initial matter, the evidence suggests that Defendants had engaged in a similar practice as the practice alleged here previously with other customers.  *See* Resp. Ex. B (ledger containing names of customers who received letters from the DA regarding their postdated checks prior to Plaintiffs).  Defendants do not appear to dispute that evidence.  Thus, there is uncontested evidence suggesting that Defendants knew there was a possibility they would submit Plaintiffs' checks to the DA if they defaulted, but failed to disclose that fact.  This is sufficient evidence to create a question of fact about whether there was a material misrepresentation.

39

Defendants' counter arguments are insufficient to overcome this evidence.  First, the fact that Plaintiffs cannot remember their conversations with loan store employees in great detail is not sufficient to warrant summary judgment on the omissions claim.  Plaintiffs appear to remember their conversations sufficiently well to present credible evidence that Defendants withheld information regarding their debt collection practices.  *See, e.g.*, Vine Depo 25:20–23 (". . . [T]hey just said that they wasn't [sic] going to cash the check and definitely didn't tell me that I will be facing any kind of criminal thing[.]").  Further, Plaintiffs specifically testified that if they had been told that Defendants would either cash the checks or seek legal action, they would not have used Defendants' services.  *See* Vine Depo. Tr. 53:8–22 ("Q. Did anyone at PLS ever promise you that they would not turn the check over to be prosecuted[?] . . . A. . . . [I]f they would have told me that, I probably wouldn't have got the other loan."); Pond Depo Tr. 53:19–24 ("Q. If PLS had told you that they might . . . try to cash your check that you gave them, would you still have signed the documents and gotten the loan from them?  A. No.").  This testimony supports the

40

claim that Plaintiffs were not told that their postdated checks would be submitted to the DA if they defaulted.

Second, Defendants claim that since no formal criminal charges were ever technically filed, there was "nothing to disclose."  Reply 8. This argument misses the mark.  Defendants are accused of failing to disclose their alleged practice of cashing a postdated check, waiting for the check to bounce, and then fraudulently submitting that check as a hot check to a local DA to try to collect the amount due.  The Court construes Plaintiffs' allegations broadly as accusing Defendants of failing to disclose this practice, rather than narrowly as applying only to the formal execution of criminal charges.  Thus, because there is sufficient evidence to withstand summary judgment on Defendants' alleged failure to disclose their practice of providing checks to the DA, the Court will deny summary judgment on this claim.

### iv.    Stating that Defendants' Checks were "Hot Checks" to the DA

Finally, Plaintiffs claim Defendants misrepresented to the DA's office that the postdated checks were "bad checks" and that the Plaintiffs had committed "theft by check."  Compl. 5.  The Court concludes that there is a material question of fact regarding whether

41

Defendants misrepresented the nature of the bounced checks to the DA's office.  The Collin County District Attorney's Office website explicitly states that postdated or hold checks are *not* considered hot checks worthy of prosecution.  *Some Things a Merchant Should Know*, CollinCountyDA.com/hot-check/ (last visited Jan. 16, 2018).  The affidavits that PLS employees submitted to the DA's office specifically indicate that postdated or hold checks are *not* hot checks.[11]  Resp. Ex. A. Yet, there is significant evidence that they submitted postdated checks to the DA's office *as* hot checks.  For instance, Defendants themselves acknowledge that the checks they submitted were postdated, Resp. Ex. D at 3, but do not dispute that the DA's website and the affidavit clearly prohibit submitting postdated checks to the hot check department.  This creates a triable issue of fact regarding the misrepresentations.

Defendants counter that even if they made misrepresentations to the DA, those alleged misrepresentations were not made to the Defendants directly.  Thus, Plaintiffs are not proper parties to sue

---

[11] As Defendants highlight, the affidavits state both that the checks submitted *are* postdated checks in one section, and that they *are not* postdated checks in a different section.  Reply 6.  For purposes of deciding summary judgment, it is only necessary to conclude that the evidence is conflicting.  That the affidavit was partially accurate is not sufficient to warrant summary judgment in the face of conflicting evidence.

Defendants for fraud.  Mot. 26–27.  However, a "misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct."  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).  That is, "a person who makes a misrepresentation is liable to the person or class of persons the maker intends or 'has reason to expect' will act in reliance upon the misrepresentation."  *Id.*  Thus, the alleged misrepresentation is actionable if Defendants had reason to expect it would influence or intended it to influence Plaintiffs' conduct.

Defendants claim that there is no evidence that they intended to spur legal action by submitting the checks to the DA's office or that they intended Plaintiffs to react to that legal action.  Mot. 26.  However, the mere fact that they submitted the checks to a law enforcement agency is sufficient circumstantial proof of their intentions.  It is self-evident that furnishing evidence of criminal activity to a District Attorney might lead that DA to pursue criminal penalties against the alleged wrongdoer, and that the alleged wrongdoer might rely on the DA's actions.  Further, the affidavits that Defendants submitted to the DA stated that the affiant "understand[s] that if charges are filed, a

warrant will be issued for the accused who may be placed in jail."  Resp.
Ex. A.  This is sufficient evidence of Defendants' intent to induce
Plaintiffs' reliance on these misrepresentations to survive summary
judgment.

In sum, Plaintiffs provide adequate evidence for three out of four
contested claims of material misrepresentations or omissions.  The
exception is the claim about misrepresenting the purpose of the
postdated check, upon which the Court will not pass due to its decision
regarding justified reliance, discussed *infra*.

### 2.  Whether there is Sufficient Evidence that Plaintiffs Justifiably Relied on the Misrepresentations

To state a fraud claim, Plaintiffs need to show that they justifiably
relied on the stated material misrepresentations or omissions.  *See Dow
Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).
Defendants claim that even if there were material misrepresentations
or omissions, Plaintiffs could not have justifiably relied on any of them,
which defeats their fraud claims.

### i. *Stating that Defendants Would not Deposit Plaintiffs' Checks*

Regarding Defendants' statements that they would not deposit Plaintiffs' postdated checks, Defendants highlight case law stating that Plaintiffs cannot justifiably rely on oral misrepresentations that contradict clear terms of the contract accompanying a transaction. *See*, *e.g.*, *Kehoe v. Pollack*, 526 S.W.3d 781, 797 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A]s a matter of law, [plaintiffs can]not justifiably rely on an oral representation that contradicts the unambiguous terms of" a contract.); *Profyt v. Wells Fargo Bank*, N.A., No. A-12-CV-383 LY, 2013 WL 12107675, at *1 (W.D. Tex. July 19, 2013) (holding that a plaintiff could not justifiably rely on an employee's representation that contradicted the clear terms of a contract). Defendants argue that here, the CSA definitively states that customers' checks are security for their loans and that they may be deposited upon default. Mot. 28 (citing the CSA, which reserves "the right to seek collection of any check or similar security you have provided us"). Thus, even if it were true that loan store employees told Plaintiffs that they were not going to deposit the checks, Plaintiffs were not justified in relying on that representation due to the language in the CSA. Plaintiffs do not appear to contest this

45

argument in their Response. Thus, to the extent Plaintiff's fraud claim is based on a misrepresentation that Defendants would not deposit any checks Plaintiffs provided, Plaintiffs could not have justifiably relied on those statements. Accordingly, the Court will grant summary judgment on that limited ground.

However, viewing the evidence in a light most favorable to Plaintiffs, the Court finds sufficient evidence of justified reliance for the remainder of the fraud claims. This includes (1) reliance on Defendants' statements that they would not seek any sort of criminal remedy upon Plaintiffs' default, (2) reliance on Defendants' failure to disclose that they would not seek any sort of criminal remedy upon Plaintiffs' default, and (3) reliance on the threatening letters issued by the DA's office which were initiated by Defendants' allegedly misleading statements to the DA.

   ii.   *Stating that Defendants Would not Threaten or Pursue Criminal Charges in Relation to the Loans*

Plaintiffs claim that the statement in the CSA promising not to threaten or pursue criminal charges is an actionable misrepresentation on which they relied. Reply 8–9. Defendants contend that because Plaintiffs admitted "they never even read" the written agreement they

46

signed, they could not have actually relied on statements in it.  Reply 9.

This argument fails for multiple reasons.  First, Defendants cannot

have it both ways.  They implore the Court to grant summary judgment

on Plaintiffs' check-cashing claim because the written agreement (which

Plaintiffs did not read) reserves Defendants' right to seek collection of

any security provided for the loan.  *See* Mot. 28 ("Plaintiffs had every

opportunity to read the terms of the agreements disclosing those facts

before executing them[.]").  Defendants then turn around and claim that

because Plaintiffs did not read the agreements, they could not have

relied on their contents.  The Court refuses to accept these conflicting

and incongruent positions.  Both parties must be held accountable for

all the terms of a mutually binding agreement, not just the provisions

that benefit their respective positions.  *Cf. Rapid Settlements, Ltd. v.

SSC Settlements*, LLC, 251 S.W.3d 129, 147 (Tex. App.—Tyler 2008, no

pet.) ("[A] nonsignatory plaintiff seeking the benefits of a contract is

estopped from simultaneously attempting to avoid the contract's

burdens[.]").  Second, no law supports Defendants' contention that a

plaintiff's failure to review a written instrument before signing it

prohibits a cause of action for fraud based on the promises in that

agreement. Under standard contract principles, failure to read an agreement does not exempt a party from the burdens of that contract. *See Clyde A. Wilson Int'l Investigations, Inc. v. Travelers Ins. Co.*, 959 F. Supp. 756, 763 (S.D. Tex. 1997) ("[O]ne is under a duty to learn the contents of a written contract before he signs it, and . . . if . . . he fails to read the contract or otherwise learn its contents, [and] he signs the same at this peril, and is estopped to deny his obligation, [he] will be conclusively presumed to know the contents of the contracts[.]"). If parties are responsible for a contract's burdens without reading it, it makes little sense to exempt them from a contract's benefits for failing to read the agreement. Third, even if there were law supporting Defendants' position, there is sufficient evidence to present a question of fact regarding whether Plaintiffs read and understood the contract in the first place. Plaintiffs present a signed contractual agreement indicating Defendants would not pursue criminal action to enforce debt obligations. *See* Resp. Ex. E at 2. That agreement includes Plaintiffs' acknowledgement that they "received, read, and retained a copy of" the agreement and "read, understood and agree to all of the terms and conditions[.]" *Id.* at 4. To counter this evidence, Defendants present

equivocal deposition testimony taken years after the contract was signed that they claim proves Plaintiffs did not read the agreement. Reply 9. However, although Plaintiff Pond testified that she does not remember whether she read the agreement and that she did not read specific parts of the agreement, she never claimed that she read *none* of the agreement. Pond Depo. Tr. 29:7–8 ("I probably didn't read them, but I don't remember if I did."); 44:5–7 (Q. But, you don't think you read the other terms of the loan? A. No. I know I didn't read that."). Plaintiff Vine testified that while she did not read the agreement "word for word," she read "some." Vine Depo. Tr. 39:2–17. Thus, the Court will deny summary judgment on this aspect of the fraud claim.

    iii. *Failing to Disclose that Defendants Would not Threaten or Pursue Criminal Charges in Relation to the Loans*

   Regarding Defendants' failure to disclose their debt collection practices, Defendants argue that there is no evidence that Plaintiffs justifiably relied on these omissions. Defendants claim that because Plaintiffs were never charged with a crime, there was no duty to disclose anything. Mot. 28. Like Defendants' similar previous arguments, this argument fails. Regardless of whether Plaintiffs were

49

ultimately charged with a crime, Plaintiffs' claim is that Defendants failed to disclose their debt collection practice of misusing a local DA's hot check restitution program to elicit threats of criminal penalties. Had Plaintiffs known about that practice, there is testimony that they would not have used Defendants' service. *See* Vine Depo. Tr. 53:8–22 ("Q. Did anyone at PLS ever promise you that they would not turn the check over to be prosecuted[?] . . . A. . . . [I]f they would have told me that, I probably wouldn't have got the other loan."); *see also* Pond Depo Tr. 53:19–24 ("Q. If PLS had told you that they might . . . try to cash your check that you gave them, would you still have signed the documents and gotten the loan from them? A. No."). This is sufficient evidence of justified reliance on Defendants' omissions.

### iv. *Stating that Defendants' Checks were "Hot Checks" to the DA*

Regarding the final misrepresentation on which Plaintiffs relied— the alleged misrepresentations to the DA—Defendants contend that because Plaintiffs did not know exactly what Defendants represented to the DA's office, they could not have relied on that information. Mot. 27 (citing *Belanger v. BAC Home Loans Servicing, L.P.*, 839 F. Supp. 2d 873, 878 (W.D. Tex. 2011 ("[A] person cannot rely on information that

he does not know[.]").  Defendants' argument fails.  The misrepresentations to the DA are part and parcel with the subsequent demand letters that the DA sent to Plaintiffs.  Defendants' alleged misrepresentations caused the DA's subsequent misrepresentations to Plaintiffs.  Evidence of Plaintiffs' reliance on the DA's statements is sufficient to withstand summary judgment on a fraud claim stemming from the misrepresentations to the DA.  *See Ernst & Young*, 51 S.W.3d at 578 ("[W]here a party makes a false representation to another with the intent or knowledge that it should be exhibited or repeated to a third party for the purpose of deceiving him, the third party, if so deceived to his injury, can maintain an action in tort against the party making the false statement for the damages resulting from the fraud.") (alteration in original).  Thus, there is sufficient evidence of justifiable reliance on Defendants' statements to the DA.

In sum, there is sufficient evidence for justifiable reliance on all of Plaintiffs' claims except for the claim that Defendants misrepresented the purpose of keeping a postdated check.  The Court will grant summary judgment on that claim, but deny summary judgment on the remaining fraud claims.

### E.    Texas Fair Debt Collection Practices Act

Finally, Plaintiffs claim Defendants violated Texas Finance Code

§ 392.301 ("DCPA"), which creates its own cause of action independent

of the DTPA.  Pursuant to the DCPA,

> (a) In debt collection, a debt collector may not use threats,
> coercion, or attempts to coerce that employ any of the following
> practices:
>> (5) threatening that the debtor will be arrested for
>> nonpayment of a consumer debt without proper court
>> proceedings;
>> (6) threatening to file a charge, complaint, or criminal action
>> against a debtor when the debtor has not violated a criminal
>> law;

Tex. Fin. Code Ann. § 392.301 (West).  Defendants first claim that since

they "did not make any such threats" *directly* to Plaintiffs, the Court

should grant summary judgment in favor of Defendants.  Mot. 29.

However, Defendants cite no law that supports the notion that a debt

collector may avoid the legal framework regulating his or her actions by

affording a third-party law enforcement agency the opportunity to make

threats on its behalf.  Viewing the evidence in a light most favorable to

Plaintiffs, the Court concludes that a question of fact exists as to

whether Defendants knew that the DA's office would threaten arrest

and whether that knowledge was a motivation for sending the bounced

52

checks to that office.  Thus, the Court declines to grant summary

judgment in favor of the Defendants on this claim.

Next, Defendants claim that Plaintiffs' DCPA claim is barred by

the applicable statute of limitations.  However, the DCPA does not

contain an explicit statute of limitations.  Defendants argue that the

limitations period is two years citing a bankruptcy court opinion and

two report and recommendations adopted by district judges.  *See* Mot.

30 (citing *In re Lopez*, No. 09-70659, 2015 WL 1207012, at *5 (Bankr.

S.D. Tex. Mar. 12, 2015); *Baker v. U.S. Bank, N.A.*, No. 4:16-CV-00407-

O-BP, 2017 WL 1155892, at *4 (N.D. Tex. Mar. 10, 2017), report and

recommendation adopted sub nom. *Baker v. U.S. Bank, N.A. for*

*Registered Holders of CSFB Home Equity Pass-Through Certificates,*

*Series 2005-F1X1*, No. 4:16-CV-00407-O-BP, 2017 WL 1133422 (N.D.

Tex. Mar. 27, 2017); *Bashore v. Bank of Am.*, No. 4:11CV93, 2012 WL

629060, at *6 (E.D. Tex. Feb. 27, 2012), report and recommendation

adopted, No. 4:11-CV-93, 2012 WL 1080864 (E.D. Tex. Mar. 30, 2012)).

All three of these cases rely solely on one Texas state case:  *Duzich*

*v. Marine Office of Am. Corp.*, 980 S.W.2d 857 (Tex. App.—Corpus

Christi, 1998).  In addition to *Duzich*, the *Bashore* case also relies on

Dorsaneo's Texas Litigation Guide § 242.01, which states in the "Practice of Debt Collection in Texas" section that for "both the common-law and statutory actions, the applicable limitations period is two years."  16-242 Dorsaneo, Texas Litigation Guide § 242.01 (2017).

However, both of these sources of law fail to provide adequate support for Defendants' position that the applicable statute of limitations is two years.  In *Duzich*, the Texas Court of Appeals held that "allegations of negligence, gross negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and unfair debt collection practices [ ] [e]ach . . . have two year statutes of limitations."  *Duzich*, 980 S.W.2d at 872.  To support this holding, the court cited the following three statutes:  Tex. Civ. Prac. & Rem. Code Ann. § 16.003, Tex. Rev. Civ. Stat. Ann. § 5069–11.11, and Tex. Bus. & Com. Code Ann. § 17.565.

Because of the string citation, it is unclear which statute corresponds to which of the five different sorts of claims mentioned. Thus, the Court will address all three statues.  First, Tex. Bus. & Com. Code § 17.565 is the statute of limitations for the DTPA, discussed earlier, which is two years.  However, this is a DCPA claim brought

54

independently of the DTPA, and thus that statute is inapplicable.

Second, Tex. Rev. Civ. Stat. § 5069 was repealed in 1997 and sections 11.01–12 were incorporated into the Texas Finance Code.  Tex. Rev. Stats. Ann. §§ 5069–11.01 to 5069–11.12 (repealed 1997) (supp. 2009–10).  As stated earlier, the Texas Finance Code does not contain a statute of limitations.  Perhaps it did before, but as it currently stands this code section provides no support whatsoever for a two-year statute of limitations on claims for unfair debt collection practices.  Thus, to the extent *Duzich* relied on that law to conclude that a two-year statute of limitations applies to DCPA claims, that holding is no longer valid.

Third, like Dorsaneo's Texas Litigation Guide, *Duzich* relies on Tex. Civ. Prac. & Rem. Code § 16.003 for the two-year limitations period.  Section 16.003 states:

> . . . a person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues.

On its face, this language does not apply to a suit for the type of unlawful debt collection practices that are at issue here.  Unless the legislature intended "debt collection" to be defined enormously broadly,

debt collection is not properly characterized as a "trespass," "conversion of personal property," "personal injury," "forcible entry," or "forcible detainer." Thus, this code section also provides no support for a two-year DCPA limitations period.[12]

As far as Dorsaneo's reference to § 16.003, it is unclear whether this statement was based on *Duzich*, the subsequent cases citing *Duzich*, or something else entirely. However, because Dorsaneo failed to provide any explanation for why that source concluded that unlawful debt collection actions fit within § 16.003, the Court cannot explain nor adopt this conclusion.

In sum, Defendants rest their two-year statute of limitations argument on a cursory sentence in a secondary source, a state-law opinion that does not appear to rest on solid legal footing, and multiple federal decisions that rest exclusively on one or both of those sources. Without a clear indication from Texas state courts or the Texas legislature that debt collection practices were meant to fall with § 16.003's ambit, the Court will not rely on Defendant's proffered authorities to conclude otherwise. Instead, the Court concludes that the

---

[12] In all likelihood, the *Duzich* court was applying this section to that plaintiff's negligence and IIED claims, which § 16.003 explicitly covers.

four-year residual statute of limitations is more appropriate for this claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.051. The residual limitations period statute states: "Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues." Tex. Civ. Prac. & Rem. Code Ann. § 16.051. Because Defendants have failed to demonstrate that any other provision of law expressly requires a two-year limitations period for DCPA suits such as this one, the Court will apply the four-year limitations period. Since this claim was brought in December 2015, it is within the four-year limitations period.[13] Thus, the DCPA claim is not time-barred and the Court will deny summary judgment on this claim.

## V.    CONCLUSION

After due consideration, the Court will grant summary judgment on the following claims: (1) Plaintiffs' malicious prosecution claims; (2) the DTPA claims based on violations of that specific statute (i.e., not the

---

[13] It is not necessary for the Court to determine the precise timing of this cause of action's accrual. Even granting Defendants the most generous accrual date possible, which is "early 2012" (the time period in which Plaintiff Vine first commissioned Defendants' services in connection with seeking a loan), Plaintiffs filed within four years of that date. Thus, the claim is not time barred.

tied-in claims); (3) the tied-in Texas Finance Code § 392 claim; and (4) the fraud claim based on Defendants' representations about the reason for requiring a post-dated check.  The Court denies summary judgment for all other claims.

Accordingly, **IT IS ORDERED** that Defendants' "Motion for Summary Judgment" (ECF No. 83) is **GRANTED IN PART AND DENIED IN PART**.

**SIGNED** this **16th day** of **January, 2018**.

PHILIP MARTINEZ
UNITED STATES DISTRICT JUDGE